IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ELECTRONIC MERCHANT SYSTEMS LLC, f/k/a FRANCIS DAVID CORP., d/b/a ELECTRONIC MERCHANT SYSTEMS, <br><br>  Plaintiff, <br><br> v. <br><br> NIKOLETTA MONTGOMERY, et al., <br><br>  Defendants. | Case No. 20-cv-1898 <br><br> Judge Dan Aaron Polster <br><br> **OPINION & ORDER** |

Before the Court is Defendant Peter Gaal's Motion to Dismiss (the "Motion"). ECF Doc. 43. For the following reasons, the Motion is GRANTED, and the case is DISMISSED.

## BACKGROUND

In April 2014, Plaintiff Electronic Merchant Systems LLC ("EMS") entered into a merchant agreement (the "2014 Agreement") with non-party Procom America LLC ("Procom"), which was owned by Defendant Peter Gaal. ECF Doc. 40 at ¶¶ 5-6; ECF Doc. 40-1. EMS is an Ohio-based company that offers payment processing services to businesses, and Procom was in the business of selling World War II tours. ECF Doc. 40 at ¶¶ 1, 6; ECF Doc. 40-2 at 1. Under the 2014 Agreement, EMS and one of its associated banks agreed to provide payment processing services to Procom on a set fee schedule. ECF Doc. 40 at ¶ 6; ECF Doc. 40-1.

The 2014 Agreement is an EMS-drafted form contract, which includes an application, a principal agreement for payment processing services, and "fine print" details for performing the contract. *See generally* ECF Doc. 40-1. Gaal and former-Defendant Nikoletta Montgomery executed the 2014 Agreement as Procom's officers. *Id.* at 2.[1]

---

[1] EMS voluntary dismissed Montgomery from the action. ECF Docs. 21, 22. Gaal is the only remaining defendant.

One of the 2014 Agreement's fine print details addresses "chargebacks," which occur when a Procom customer's transaction is declined or cancelled after Procom's account was credited for the sale. *Id.* In this scenario, EMS covered the refund to the Procom customer and then "charged back" that debt to Procom. *Id.* Procom was contractually required not only to reimburse EMS for the full amount of the chargeback, but also to pay a chargeback fee of up to $25. *Id.*

Gaal personally guaranteed Procom's obligations under the 2014 Agreement, including any outstanding chargeback debt. ECF Doc. 40 at ¶¶ 20-21; ECF Doc. 40-1 at 2. Like the 2014 Agreement, the guaranty is an EMS-drafted form contract, and it states:

> The undersigned (jointly and severally if more than one) in consideration of BANK and EMS entering into this Merchant Agreement ("Agreement") with [Procom], hereby absolutely and unconditionally guarantee the full and prompt payment of any and all amounts owed to BANK and EMS and the performance of all MERCHANT'S obligations ***under this Agreement*** as may be subsequently amended from time to time, whether before or after termination or expiration of the Agreement. . . . This Guaranty is continuing, binding upon heirs and successors and may not be changed except in writing and signed by BANK and EMS.

ECF Doc. 40-1 at 2 (emphasis added).

Thereafter, on June 10, 2019, EMS and Procom executed a second merchant agreement (the "2019 Agreement"), which was also an EMS-drafted form contract. ECF Doc. 40 at ¶ 7; ECF Doc. 40-2. The 2019 Agreement addressed the same rights and obligations that were detailed in the 2014 Agreement, but the new form contract altered some contract terms in manner that benefited EMS. *Compare* ECF Doc. 40-1, *with* ECF Doc. 40-2. For instance, both the 2014 Agreement and the 2019 Agreement outlined the chargeback process, but EMS altered the agreement to increase its chargeback fee limit from $25 to $45 in the 2019 Agreement. ECF Doc. 40-2 at 2. To make the 2019 Agreement complete, the contract contained an integration clause, which stated in relevant part:

> This Agreement, including the Application and any other documents executed in conjunction herewith, constitutes and expresses the entire agreement and understanding between [Procom], Bank and EMS with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, inducements, or conditions, by Bank, EMS or its sales representative, whether expressed or implied, oral or written.

*Id.* at 7. Notwithstanding the integration clause, EMS has alleged that the 2019 Agreement is "a supplement" to the 2014 Agreement and that the 2014 Agreement remained in force. ECF Doc. 40 at ¶¶ 8-19; ECF Doc. 40-2. EMS further alleges that the contracting parties did not intend to alter their contractual dealings, but rather Gaal directed a Procom employee to execute a new contract with EMS because Montgomery had left the company. ECF Doc. 40 at ¶¶ 8-19.

Gaal was neither a signatory to the 2019 Agreement nor a guarantor for Procom's obligations under the new contract. ECF Doc. 40-2. Like the prior agreement, the 2019 Agreement contained a form guaranty, but a different Procom employee executed the guaranty and replaced Gaal as Procom's guarantor. *Id.* at 2.

From March 2020 through October 2020, at the outset of the COVID-19 pandemic, many Procom customers canceled their tour purchases with their credit card companies, and this resulted in $10,363,188.48 of chargebacks. ECF Doc. 40 at ¶¶ 26-40; ECF Doc. 40-3 at 6-44. Some of these customers purchased Procom tours prior to June 10, 2019, while other purchases were made on or after that date. ECF Doc. 40-3 at 6-44. Procom failed to reimburse EMS for the chargebacks, and EMS then demanded that Gaal pay Procom's outstanding debts as the guarantor. ECF Doc. 40 at ¶ 29. Gaal has not paid the debt. *Id.*

In May 2020, EMS filed an involuntary bankruptcy petition against Procom in the United States Bankruptcy Court for the Middle District of Florida, and that matter is still ongoing. *Id.* at ¶ 5; *see also* Involuntary Bankr. Pet., In re Procom, 8:20-bk-3522 (M.D. Fla. Bankr. May 5, 2020). In this bankruptcy proceeding, EMS filed a creditor's claim, and EMS's Chief Financial Officer

attested that the submission was true and accurate under penalty of perjury. *See* Claim No. 528-1, In re Procom, 8:20-bk-3522 (M.D. Fla. Bankr. Aug. 13, 2020). EMS's claim submission included Procom's account statements and a summary of the outstanding chargeback debt, and these documents show that EMS assessed a $45 fee for each chargeback. *Id.* at 528-5, 528-6.

On August 25, 2020, EMS instituted the current action. ECF. Doc. 1. After Gaal moved to dismiss the action for lack of personal jurisdiction and for failure to state a claim, the Court allowed EMS to amend its complaint. ECF Docs. 33, 36. The amended complaint brings three causes of action against Gaal: breach of the guaranty, unjust enrichment, and fraud. ECF Doc. 40 at 4-6. EMS seeks to recover the same debt that prompted it to file the involuntary bankruptcy petition.

Gaal has now moved to dismiss the amended complaint. ECF Doc. 43. EMS has opposed the Motion, and Gaal filed a reply brief. ECF Docs. 47, 48. The Court has reviewed the parties' submissions and now dismisses the action because EMS has failed to state a claim against Gaal.

## ANALYSIS

The Motion seeks dismissal of all three counts on two grounds: failure to state a claim under Rule 12(b)(6) and lack of personal jurisdiction under Rule 12(b)(2). As a preliminary matter, the Court notes that EMS did not respond to Gaal's arguments to dismiss its unjust enrichment and fraud claims, and dismissal of these two counts is appropriate because EMS conceded the argument.[2] Therefore, the remaining questions presented by the Motion are whether EMS has stated a claim against Gaal for breach of his guaranty and whether the Court has personal jurisdiction over Gaal. The Court begins with the Rule 12(b)(6) branch of the Motion.

---

[2] *See Santo's Italian Café LLC v. Acuity Ins. Co.*, 508 F. Supp. 3d 186, 207 (N.D. Ohio 2020) ("It is well understood . . . that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

When deciding a Rule 12(b)(6) motion to dismiss, a district court's function is to test the legal sufficiency of the complaint. *See Mayer v. Mulod*, 988 F.2d 635, 638 (6th Cir. 1993). The court must accept as true all well-pleaded allegations and draw all reasonable inferences in favor of the non-moving party. *See Shoup v. Doyle*, 974 F. Supp. 2d 1058, 1071 (S.D. Ohio 2013) (citing *Handy–Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 538 (6th Cir. 2012)).

"[I]f it appears beyond doubt that the plaintiff can prove no set of facts in support of its claims that would entitle it to relief, then dismissal is proper." *Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 575 (6th Cir. 2008) (internal alterations omitted). Accordingly, when a dispute is governed by a contract, dismissal is appropriate when the contract's plain terms foreclose any avenue to the requested relief. *See Northampton Rest. Grp., Inc. v. FirstMerit Bank, N.A.*, 492 F. App'x 518, 520 (6th Cir. 2012). Likewise, the court need not accept as true any allegation that contradicts a governing contract's plain and unambiguous language. *Cf. Thomas v. Publishers Clearing House, Inc.*, 29 F. App'x 319, 322 (6th Cir. 2002) (affirming dismissal by looking past the pleadings to the controlling documents).

Additionally, in testing the sufficiency of the complaint, the district court's review is typically limited to the complaint's allegations, but "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint" may also be considered without converting the dismissal motion into one for summary judgment. *Meyers v. Cincinnati Bd. of Educ.*, 983 F.3d 873, 880 (6th Cir. 2020). Still, the court may consider a public record's contents only if the record "proves facts whose accuracy cannot reasonably be questioned." *Passa v. City of Columbus*, 123 F. App'x 694, 698 (6th Cir. 2005). As such, a court may consider bankruptcy filings as a matter of public record. *See Winget*, 537 F.3d at 576 (holding that a district court properly took judicial notice of bankruptcy court documents).

With this familiar framework in mind, the Court has determined that the Motion boils down to a single, dispositive issue: whether Procom's chargeback debt accrued under the 2014 Agreement or under the 2019 Agreement. This is because the parties agree that the plain language of Gaal's guaranty applies only to Procom's obligations under the 2014 Agreement, *see* ECF Doc. 43 at 14-19; ECF Doc. 47 at 10-13, and there can be no breach if Gaal had no obligation to pay the debt EMS now seeks. The parties diverge, however, on whether the chargeback debt at issue is an obligation under the 2014 Agreement—Gaal posits that the debt is an obligation under the 2019 Agreement because that agreement superseded the 2014 Agreement and each chargeback occurred in March 2020 or after, whereas EMS principally claims that the 2014 Agreement applies because the 2019 Agreement was a "supplement" that did not supersede or extinguish the original contract. Accordingly, the Court must first determine the relationship of the 2019 Agreement to the 2014 Agreement and then determine which agreement governs Procom's outstanding debt.

Resolution of the dispositive issue is, thus, a matter of contract interpretation, which may be properly decided as a matter of law at the pleadings stage. *See In re Fifth Third Early Access Cash Adv. Litig.*, 925 F.3d 265, 276 (6th Cir. 2019) (citing *Envision Waste Servs., LLC v. Cty. of Medina*, 83 N.E.3d 270, 275 (Ohio Ct. App. 2017) (stating that contract interpretation is a legal question under Ohio law)).[3] And, when interpreting a contract, the Court must give effect to the parties' intent, which is found in the contract's plain and unambiguous language. *See CoMa Ins. Agency, Inc. v. Safeco Ins. Co.*, 526 F. App'x 465, 467-68 (6th Cir. 2013) (applying Ohio contract law). When contracting parties have entered into successive contracts, their intent may also be

---

[3] Both the 2014 Agreement and the 2019 Agreement state that Ohio law governs these contracts, and neither party challenges the choice of law provision. *See* ECF Doc. 40-1 at 4; ECF Doc. 40-2 at 7. Accordingly, the Court applies Ohio law to interpret the relevant contract provisions. *See Whitt Mach., Inc. v. Essex Ins. Co.*, 377 F. App'x 492, 495-96 (6th Cir. 2010) ("When jurisdiction is based on diversity of citizenship, state substantive law is used when interpreting contract provisions.").

discerned through comparison: "Where a subsequent contract unambiguously displays the parties' intention to supersede or modify terms in a previous contract, the terms of the subsequent contract will control." *Schempp v. GC Acquisition, LCC*, 161 F. Supp. 3d 584, 591 (N.D. Ohio 2014) (citing *TRINOVA Corp. v. Pilkington Brothers*, P.L.C., 70 Ohio St.3d 271, 638 N.E.2d 572, 576 (1994)).

Turning first to the contracts, the Court has reviewed both and concludes that the 2019 Agreement superseded the 2014 Agreement in all material respects. As an initial matter, the 2019 Agreement contains a clear and unambiguous integration clause, which states that the 2019 Agreement "supersedes all prior and contemporaneous agreements and understandings" between EMS and Procom. ECF Doc. 40-2 at 7. This plain language confirms that EMS and Procom intended for the 2019 Agreement to govern their future dealings—meaning that if any part of the 2019 Agreement expressly alters a term in the 2014 Agreement, then the 2019 Agreement supersedes the original contract with respect to that term. Moreover, the chargeback provision was, in fact, altered to EMS's benefit by the 2019 Agreement: while EMS could impose a fee of no more than $25 for each chargeback under the 2014 Agreement, that fee amount was increased to a flat $45 fee per chargeback under the 2019 Agreement. Taken together, these pieces of the 2019 Agreement demonstrate that EMS and Procom intended to—and did—supersede the 2014 Agreement.

EMS's argument that the parties intended for the 2019 Agreement to supplement rather than replace the 2014 Agreement does not alter the Court's conclusion. *See* ECF Doc. 47 at 10-13. While EMS alleges that it did not intend to extinguish any part of the 2014 Agreement, the Court has no obligation to accept these allegations as true because they are contradicted by the 2019 Agreement's plain terms. *See Thomas*, 29 F. App'x at 322. Furthermore, as Gaal correctly points out, the parties' subjective intent has no role in contract interpretation where, as here, the relevant

contract language is plain and unambiguous. *See Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763-64 (6th Cir. 2008). This is particularly true for EMS because it drafted the form contract that constitutes the 2019 Agreement, but EMS did not modify any contract terms to reflect the intent it now alleges. The simple fact is that EMS obtained additional benefits by having Procom execute the 2019 Agreement, and EMS cannot now avoid the 2019 Agreement's pitfalls by alleging subjective beliefs to contradict the contract's plain terms.

But concluding that the 2019 Agreement superseded the 2014 Agreement answers only half of the dispositive question. The Court must also determine which of the two agreements was in place when Procom's chargeback debt accrued.

Accordingly, the Court next concludes that every chargeback occurred in March 2020 or after. EMS has seemingly tried to obfuscate this fact—the first amended complaint does not include any allegations about the specific chargebacks, and EMS's response brief was accompanied by an affidavit in which a corporate representative stated that some of the chargebacks occurred prior to June 10, 2019.[4] However, in Procom's bankruptcy proceeding, EMS submitted a claim that included Procom's monthly account statements from EMS, as well as a full accounting of Procom's chargeback debt. *See* Proof of Claim No. 528-5, 528-6, In re Procom America, LLC, 20-bk-3522 (M.D. Fla. Bankr. Aug. 13, 2020).[5] In doing so, EMS made Procom's

---

[4] The Court has ultimately disregarded the Moenich affidavit for its Rule 12(b)(6) analysis. EMS submitted this affidavit, in part, to provide facts about Procom's chargeback debt, but none of this information is alleged in the first amended complaint. Thus, the Court will not consider the affidavit's contents because Rule 12(b)(6) review is limited the complaint, attendant contracts, and public records.

[5] The Court has taken judicial notice of EMS's filing in Procom's bankruptcy proceeding. Those documents are public records, and EMS cannot dispute the validity of the account statements and chargeback accounting because EMS's CFO attested to their accuracy under penalty of perjury. Moreover, Gaal relied on EMS's claim documents in the Motion, and EMS did not challenge this practice or otherwise dispute that EMS is seeking to collect the same debt in both proceedings. Nor should EMS be permitted to avoid dismissal by making conclusory allegations about Procom's chargeback debt in the first amended complaint, when EMS had already submitted a detailed accounting of the debt to the bankruptcy court. The Court has therefore considered the Procom account statements in EMS's bankruptcy claim for the limited purpose of confirming when the chargebacks occurred.

account documents a matter of public record, and those documents confirm that every chargeback occurred in March 2020 or later. Therefore, every chargeback is an obligation arising under the 2019 Agreement because that contract controlled the parties' relationship as of June 10, 2019.

EMS posits that the chargeback accrual date is irrelevant to the analysis and, instead, that the date of the original transaction determines which of the two contracts applies. From this premise, EMS has alternatively argued that, even if the 2019 Agreement superseded the 2014 Agreement, Gaal is still personally liable for any chargeback that has an original transaction date prior to June 10, 2019. *See* ECF Doc. 47 at 10-13.

The Court disagrees with EMS's position. A guarantor has no obligation until a debt accrues, which makes the debt's accrual date crucial to the analysis. *Cf. CBS Personnel Servs., LLC v. Canadian Am. Trans, Inc.*, 290 F. Supp. 2d 879, 886 (S.D. Ohio 2003) (holding that a guarantor was not liable for debts that accrued after the execution of a superseding contract but was liable for debts that accrued prior to that date). Here, Gaal has no obligation because Procom had no outstanding chargeback debt—or, more specifically, no chargeback debt that is sought in this lawsuit—when the 2019 Agreement was executed. In fact, EMS's bankruptcy claim again confirms this conclusion: Procom's account statements show that EMS assessed a $45 fee for each chargeback, including those with original transaction dates prior to June 10, 2019. *See* Proof of Claim No. 528 at Ex. 5, In re Procom America, LLC, 20-bk-3522 (M.D. Fla. Bankr. Aug. 13, 2020). Yet, a $45 chargeback fee was authorized only by the 2019 Agreement, whereas the 2014 Agreement capped the chargeback fee at $25. *Compare* ECF Doc. 40-1 at 2, *with* ECF Doc. 40-2 at 2. Thus, EMS is attempting to seek the benefit of the 2019 Agreement in bankruptcy court for the pre-June 10, 2019 transactions, while simultaneously disavowing that contract's applicability to the same transactions before this Court. Putting aside the problems with this litigation strategy

and the potential judicial estoppel concerns, the fact remains that Procom's account statements objectively demonstrate that the chargebacks arose under the 2019 Agreement.

In sum, Gaal's personal guaranty does not extend to any of the chargeback debt that EMS seeks to recover in this action. The plain language of the guaranty states that Gaal is liable only for obligations arising under the 2014 Agreement, and that agreement was eventually superseded by the 2019 Agreement. Thus, because every chargeback at issue occurred in March 2020 or after, Procom's outstanding debt accrued under the 2019 Agreement, and someone other than Gaal guaranteed Procom's performance under that contract. Therefore, the relevant contracts foreclose EMS's attempts at recovery as a matter of law, and Gaal is entitled to dismissal of the breach of warranty claim. And, because dismissal is appropriate under Rule 12(b)(6), the Court need not reach Gaal's personal jurisdiction argument under Rule 12(b)(2).

## CONCLUSION

For the foregoing reasons, Gaal is entitled to dismissal under Rule 12(b)(6). Therefore, the Motion to Dismiss (ECF Doc. 43) is **GRANTED**, and the case is hereby **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

**Date:** June 16, 2022

*/s/ Dan Aaron Polster*
**Dan Aaron Polster**
**United States District Judge**